**ON REHEARING**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

WILLIAM SAMUEL CHESTER, JR.,

        *Defendant-Appellant.*

No. 09-4084

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(2:08-cr-00105-1)

Argued: December 4, 2009

Decided: December 30, 2010

Before TRAXLER, Chief Judge, and AGEE and DAVIS,
Circuit Judges.

Vacated and remanded by published opinion. Chief Judge
Traxler wrote the majority opinion, in which Judge Agee
joined. Judge Davis wrote a separate opinion concurring in
the judgment.

**COUNSEL**

**ARGUED**: Edward Henry Weis, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Charleston, West Virginia, for

Appellant. Elizabeth Dorsey Collery, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, Jonathan D. Byrne, Appellate Counsel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Charles T. Miller, United States Attorney, Gerald M. Titus, III, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

---

## COUNSEL

TRAXLER, Chief Judge:

The sole issue presented in this appeal is whether William Samuel Chester's conviction for illegal possession of a firearm under 18 U.S.C. § 922(g)(9) abridges his right to keep and bear arms under the Second Amendment in light of *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). We vacate the decision below and remand for further proceedings.

## I.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *Heller* resolved a decades-long debate between those who interpreted the text to guarantee a private, individual right to bear arms and those who generally read it to secure a collective right to bear arms in connection with service in the state militia.[1] *See Heller*, 128 S. Ct. at 2789. *See*

---

[1]There are two basic manifestations of the collective-right view of the Second Amendment. The first model understands the Second Amendment simply to "empower state governments to arm militias," while the second model "argues that individuals have a right to own and possess firearms under the Second Amendment, but only insofar as it is connected with state militia service." *See* Kenneth A. Klukowski, *Armed By Right: The Emerging Jurisprudence of the Second Amendment*, 18 Geo. Mason U. Civ. Rts. L.J. 167, 175-76 (2008).

*generally Parker v. District of Columbia*, 478 F.3d 370, 379 (D.C. Cir. 2007) (explaining the collective right and individual right positions in the Second Amendment debate); *United States v. Emerson*, 270 F.3d 203, 218-20 (5th Cir. 2001) (same). Interpreting the text in light of how it would have been understood by "ordinary citizens in the founding generation," *Heller*, 128 S. Ct. at 2788, the Supreme Court sided with proponents of the individual right view and held that the Second Amendment guaranteed protection of an individual right to possess and carry arms without regard to militia service. *See id*. at 2799.

The Court began its textual analysis by explaining that the function of the Second Amendment's prefatory clause ("A well regulated Militia, being necessary to the security of a free State") is merely to announce a purpose for the command given by the operative clause ("the right of the people to keep and bear Arms, shall not be infringed")—"apart from that clarifying function, [the] prefatory clause does not limit or expand the scope of the operative clause." *Id*. at 2789.[2] The operative clause, *Heller* concluded, "guarantee[s] the individual right to possess and carry weapons in case of confrontation," a meaning that "is strongly confirmed by the historical background of the Second Amendment." *Id*. at 2797. Consideration of the historical sources was important because, as *Heller* explained, "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Id*. Finally, the Court explained why the prefatory clause was consistent with an individual right interpretation of the operative clause:

---

[2]The collective versus individual right debate turned largely on the relationship between the two clauses. "[I]ndividual right theorists say that the operative clause's effect is unmodified by the civic purpose announced in the prefatory clause, . . . while collective right theorists claim that the prefatory clause limits the scope of the Amendment . . . [to] the perpetuation of the militia system." *See* Klukowski, *Armed by Right*, *supra*, at 180-81.

The debate with respect to the right to keep and bear arms, as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution. . . . It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down.

It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right-unlike some other English rights-was codified in a written Constitution.

*Id*. at 2801.

Significantly, *Heller* recognized that the right to keep and bear arms, like other Constitutional rights, is limited in scope and subject to some regulation: "[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Id*. at 2799; *see id*. at 2816 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). One specific limitation recognized in *Heller* concerned the *types* of weapons protected by the Second Amendment. In accordance "with the historical under-

standing of the scope of the right," the Second Amendment protected only weapons "typically possessed by law-abiding citizens for lawful purposes." *Id*. at 2816; *see id*. at 2817 (explaining that the Second Amendment protected "the right to keep and carry arms . . . in common use at the time") (internal quotation marks omitted).

The other type of limitation identified in *Heller* involved what the Supreme Court termed "presumptively lawful regulatory measures," *id*. at 2817, n.26, although *Heller* did not explain *why* the listed regulations are presumptively lawful:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 2816-17.[3] Although the Court expressly declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," *id*. at 2816, it clearly staked out the core of the Second Amendment. Indeed, *Heller* explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 2821.

In light of these principles, the Supreme Court invalidated two District of Columbia statutes at issue in *Heller*. First, *Heller* invalidated the District's total ban on the possession of handguns, concluding that such a complete ban—which extended "to the home, where the need for defense of self,

---

[3]The Supreme Court reiterated, without further explanation, these presumptively valid limitations in *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010).

family, and property is most acute[,]"—was incompatible
with the Second Amendment "[u]nder any of the standards of
scrutiny that we have applied to enumerated constitutional
rights." *Id.* at 2817-18. Although the Court acknowledged that
rational-basis scrutiny would be inappropriate, *see id.* at 2817,
n.27, it declined to choose the proper level of scrutiny for
Second Amendment challenges. Second, *Heller* concluded
that the District's requirement that citizens keep their firearms
in an inoperable condition "[made] it impossible for citizens
to use [firearms] for the core lawful purpose of self-defense."
*Id.* at 2818.

## II.

In October 2007, officers from the Kanawha County, West
Virginia, Sheriff's Department responded to a 911 call report-
ing a domestic disturbance at Chester's residence. Chester's
wife reported to the officers that Chester grabbed her throat
and threatened to kill her after she caught him receiving the
services of a prostitute on their property. In a subsequent
search of the home, officers recovered a 12-gauge shotgun in
the kitchen pantry and a 9mm handgun in the bedroom. Ches-
ter admitted both firearms belonged to him.

In May 2008, as a result of this incident, Chester was
indicted for possessing firearms after having been convicted
"of a misdemeanor crime of domestic violence" in violation
of 18 U.S.C. § 922(g)(9). The indictment charged that in Feb-
ruary 2005, Chester had been convicted in Kanawha County
Magistrate Court of domestic assault and battery, a misde-
meanor offense under West Virginia law. *See* W. Va. Code
§ 61-2-28(a) and (b). Chester conceded that the 2005 domes-
tic assault and battery offense qualified as a predicate "misde-
meanor crime of domestic violence" under § 922(g)(9).[4]

---

[4]For purposes of 18 U.S.C. § 922(g)(9), a "misdemeanor crime of
domestic violence" is defined as an offense that "is a misdemeanor under
Federal, State, or Tribal law" and "has, as an element, the use or attempted
use of physical force, or the threatened use of a deadly weapon, committed
by a current or former spouse . . . of the victim." 18 U.S.C.
§ 921(a)(33)(a).

Chester moved to dismiss the indictment, arguing that § 922(g)(9), both on its face and as applied to him in this instance, violated his Second Amendment right to keep and bear arms under *Heller*. Seizing upon *Heller*'s list of "presumptively lawful regulatory measures" including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," 128 S. Ct. at 2817 & n.26, the district court reasoned by analogy that "the prohibition by Congress as embodied in § 922(g)(9) of the possession of a firearm by a misdemeanant who has committed a crime of domestic violence is a lawful exercise by the government of its regulatory authority notwithstanding the Second Amendment." *United States v. Chester*, No. 2:08-00105, 2008 WL 4534210, at *2 (S.D.W.Va. Oct. 7, 2008). The district court concluded that, like the felon dispossession provision set forth in § 922(g)(1), the prohibition of firearm possession by domestic violence misdemeanants is a danger-reducing regulation designed "to protect family members and society in general from potential [violence]." *Id*. In fact, the district court believed that, if anything, "the need to bar possession of firearms by domestic violence misdemeanants" is "often far greater than that of the similar prohibition of § 922(g)(1) on those who commit nonviolent felonies." *Id*. Thus, the district court denied the motion to dismiss the indictment, and Chester entered a conditional guilty plea, reserving his right to raise on appeal the application of the Second Amendment.

Chester then filed this appeal. In February 2010, we vacated the judgment and remanded in an unpublished opinion. *See United States v. Chester*, No. 09-4084, 367 Fed. Appx. 392, 2010 WL 675261 (4th Cir. Feb. 23, 2010) (per curiam). We declined to find § 922(g)(9) valid by analogy based on *Heller*'s "presumptively lawful" language, and we remanded for the district court to conduct an analysis of whether § 922(g)(9) could be "'independently justified'" in light of *Heller*. *Id*. at 398. Our approach followed that taken in *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010) (en banc), a panel deci-

sion that was vacated by the Seventh Circuit for *en banc* review at about the same time that we released our opinion in *Chester*. In *Skoien*, the defendant was convicted under 18 U.S.C. § 922(g)(9) for illegally possessing a shotgun that he claimed to have kept for hunting purposes. The *Skoien* panel reasoned that because "the core right of self-defense identified in *Heller* [was] not implicated," intermediate scrutiny was the appropriate standard to apply to the defendant's Second Amendment challenge to § 922(g)(9). *Id*. at 805. The panel voted to remand the case to give the government an opportunity to carry its burden imposed by the intermediate constitutional framework:

> Under intermediate scrutiny, the government need not establish a close fit between the statute's means and its end, but it must at least establish a *reasonable* fit. The government has done almost nothing to discharge this burden. Instead, it has premised its argument almost entirely on *Heller*'s reference to the presumptive validity of felon-dispossession laws and reasoned by analogy that § 922(g)(9) therefore passes constitutional muster. That's not enough.

*Id*. at 805-06. Similarly, we remanded Chester's appeal for clarification of the precise contours of his Second Amendment claim—a necessary step in determining the appropriate standard of constitutional scrutiny to apply—and for development of the record under the appropriate means-end framework. *See Chester*, 2010 WL 675261, at *6. We stopped short, however, of identifying the proper level of scrutiny, leaving that task to the district court on remand.

After we issued the unpublished *Chester* opinion, the government filed a petition for panel rehearing in light of the fact that the *Skoien* panel decision had been vacated by the Seventh Circuit *en banc*. While Chester's petition for rehearing was pending, the Seventh Circuit issued its en banc decision in *Skoien*, rejecting the Second Amendment challenge to

§ 922(g)(9) on the basis that "logic and data" demonstrate "a substantial relation between § 922(g)(9) and [an important governmental] objective." 614 F.3d at 642. We now grant panel rehearing, vacate our initial opinion and reissue our decision to provide district courts in this Circuit guidance on the framework for deciding Second Amendment challenges.

### III.

We turn first to the question of how to evaluate Chester's Second Amendment challenge to § 922(g)(9). To the extent *Heller* provides an answer to this question, it would be found in the Court's truncated discussion of the limitations on the right to bear arms preserved by the Second Amendment. As noted previously, *Heller* recognized that the pre-existing right guaranteed by the Second Amendment "was not unlimited, just as the First Amendment's right of free speech was not." *Heller*, 128 S. Ct. at 2799; *see id*. at 2816. And because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," *id*. at 2797, determining the limits on the scope of the right is necessarily a matter of historical inquiry. *Heller* declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," *id*. at 2816, but did identify one specific historical limitation as to *which* arms a citizen had the right to bear. In accordance "with the historical understanding of the scope of the right," the Second Amendment protected only weapons "typically possessed by law-abiding citizens for lawful purposes." *Id*. at 2816; *see id*. at 2817 (explaining that the Second Amendment protected "the right to keep and carry arms . . in common use at the time") (internal quotation marks omitted). The Court found support for this limitation in "'the historical tradition of prohibiting the carrying of dangerous and unusual weapons.'" *Id*. at 2817. Thus, a citizen's right to carry or keep sawed-off shotguns, for instance, would not come within the ambit of the Second Amendment. *See id*. at 2816.

Having acknowledged that the scope of the Second Amendment is subject to historical limitations, the Court cautioned that *Heller* should not be read "to cast doubt on longstanding prohibitions" such as "the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. at 2816-17. *Heller* described its exemplary list of "longstanding prohibitions" as "presumptively lawful regulatory measures," *id*. at 2817, n.26, without alluding to any historical evidence that the right to keep and bear arms did not extend to felons, the mentally ill or the conduct prohibited by any of the listed gun regulations. It is unclear to us whether *Heller* was suggesting that "longstanding prohibitions" such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason. *See United States v. Rene E*., 583 F.3d 8, 12 (1st Cir. 2009) (concluding that *Heller* "identified limits deriving from various historical restrictions on possessing and carrying weapons," including the felon dispossession provision, that "were left intact by the Second Amendment"). Federal felon dispossession laws, for example, were not on the books until the twentieth century, and the historical evidence and scholarly writing on whether felons were protected by the Second Amendment at the time of its ratification is inconclusive. But even if the listed regulations were not historical limitations on the scope of the Second Amendment, the Court could still have viewed the regulatory measures as "presumptively lawful" if it believed they were valid on their face under any level of means-end scrutiny applied.[5]

---

[5]Other courts have found *Heller*'s list of "presumptively lawful" firearm regulations susceptible to two meanings. *See United States v. Marzzarella*, 614 F.3d 85, 91 (3rd Cir. 2010) ("We recognize the phrase 'presumptively lawful' could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because

Some courts have treated *Heller*'s listing of "presumptively lawful regulatory measures," for all practical purposes, as a kind of "safe harbor" for unlisted regulatory measures, such as 18 U.S.C. § 922(g)(9), which they deem to be analogous to those measures specifically listed in *Heller*. *See, e.g.*, *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010) ("We see no reason to exclude § 922(g)(9) from the list of long-standing prohibitions on which *Heller* does not cast doubt."). This approach, however, approximates rational-basis review, which has been rejected by *Heller*. *See Heller*, 128 S. Ct. at 2817, n.27. In fact, the phrase "*presumptively* lawful regulatory measures" suggests the possibility that one or more of these "longstanding" regulations "could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010).

In view of the fact that *Heller* ultimately found the District's gun regulations invalid "under any standard of scrutiny," it appears to us that the Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter. The government bears the burden of justifying its regulation in the context of heightened scrutiny review; using *Heller*'s list of "presumptively lawful regulatory measures" to find § 922(g)(9) constitutional by analogy would relieve the government of its burden.

Thus, a two-part approach to Second Amendment claims seems appropriate under *Heller*, as explained by the Third Circuit Court of Appeals, *see Marzzarella*, 614 F.3d at 89, and Judge Sykes in the now-vacated *Skoien* panel opinion, *see*

---

they pass muster under any standard of scrutiny."); *Skoien*, 587 F.3d at 808 ("[I]t is not entirely clear whether this language should be taken to suggest that the listed firearms regulations are presumed to fall outside the scope of the Second Amendment right as it was understood at the time of the framing or that they are presumptively lawful under even the highest standard of scrutiny applicable to laws that encumber constitutional rights.").

587 F.3d at 808-09. The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id*. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. *See Heller*, 128 S. Ct. at 2816. If it was not, then the challenged law is valid. *See Marzzarella*, 614 F.3d at 89. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. *See id*. *Heller* left open the issue of the standard of review, rejecting only rational-basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

### A.

Under this approach, the first question is whether § 922(g)(9) burdens or regulates conduct that comes within the scope of the Second Amendment—*i.e.*, whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment. *Cf. Marzzarella*, 615 F.3d at 89 ("Our threshold inquiry, then, is whether [the challenged law] regulates conduct that falls within the scope of the Second Amendment. In other words, we must determine whether the possession of an unmarked firearm in the home is protected by the right to bear arms."). Section 922(g)(9), like the felon-dispossession provision set forth in § 922(g)(1), permanently disarms an entire category of persons. Thus, we are seeking to determine whether a person, rather than the person's conduct, is unprotected by the Second Amendment. *See Skoien*, 614 F.3d at 649 (Sykes, J., dissenting) (framing the threshold question as "whether persons convicted of a domestic-violence misdemeanor are completely 'outside the reach' of the Second Amendment as a

matter of founding-era history and background legal tradi-
tion").

In this case, the government has not taken the position that
persons convicted of misdemeanors involving domestic vio-
lence were altogether excluded from the Second Amendment
as it was understood by the founding generation. Moreover,
it appears to us that the historical data is not conclusive on the
question of whether the founding era understanding was that
the Second Amendment did not apply to felons. *See Williams*,
616 F.3d at 692 (noting that "[t]he academic writing on the
subject of whether felons were excluded from firearm posses-
sion at the time of the founding is inconclusive at best" (inter-
nal quotation marks omitted)); *Skoien*, 614 F.3d at 650-51
(Sykes, J., dissenting) ("[S]cholars disagree about the extent
to which *felons*-let alone misdemeanants-were considered
excluded from the right to bear arms during the founding era.
. . . We simply cannot say with any certainty that persons con-
victed of a domestic-violence misdemeanor are wholly
excluded from the Second Amendment right as originally
understood."); *United States v. McCane*, 573 F.3d 1037, 1048
(10th Cir. 2009) (Tymkovich, J., concurring) ("[T]he felon
dispossession dictum may lack the 'longstanding' historical
basis that *Heller* ascribes to it. Indeed, the scope of what
*Heller* describes as 'longstanding prohibitions on the posses-
sion of firearms by felons' . . . is far from clear.").

Of course, we are dealing in this appeal not with felons but
people who have been convicted of domestic-violence misde-
meanors. If the historical evidence on whether felons enjoyed
the right to possess and carry arms is inconclusive, it would
likely be even more so with respect to domestic-violence mis-
demeanants. The federal provision disarming domestic-
violence misdemeanants is of recent vintage, having been
enacted in 1996 as part of the Lautenberg Amendment to the
Gun Control Act of 1968. *See* Pub. L. No. 104-208, § 658,
110 Stat. 3009, 3009-371 to -372 (1996). By contrast, the fed-
eral felon dispossession provision has existed in some form or

another since the 1930s, and thus there is a much larger body of scholarly work considering the question of whether felons were originally excluded from the protection afforded by the Second Amendment. Commentators are nonetheless divided on the question of the categorical exclusion of felons from Second Amendment protection. *Compare* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009) (reviewing founding-era precedents and explaining that, "much like the American authorities for a century and a half after the Second Amendment's adoption, the actual English antecedents point against lifetime total disarmament of all 'felons,' but do support lesser limitations"), *and* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) (explaining that because state and federal "felon disarmament laws significantly postdate both the Second Amendment and the Fourteenth Amendment[,] [a]n originalist argument that sought to identify 1791 or 1868 analogues to felon disarmament laws would be quite difficult to make"), *with* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations & Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) ("[T]here is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms."), *and* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (opining that "felons, children, and the insane were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise").

   The government has not contended that § 922(g)(9) is valid because Chester, having been convicted of a domestic violence misdemeanor, is wholly unprotected by the Second Amendment. Based on this and the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not

apply to persons convicted of domestic violence misdemeanors. We must assume, therefore, that Chester's Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense.[6] The question then becomes whether the government can justify, under the appropriate level of scrutiny, the burden imposed on Chester's Second Amendment rights by § 922(g)(9). *Cf. Marzzarella*, 614 F.3d at 95 (applying intermediate scrutiny after finding insufficient evidence to establish with certainty "that the possession of unmarked firearms in the home is excluded from the right to bear arms").

## B.

*Heller* left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context. *See Heller*, 128 S. Ct. at 2817, n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Our task, therefore, is to select between strict scrutiny and intermediate scrutiny. Given *Heller*'s focus on "core" Second Amendment conduct and the Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment. *See Marzzarella*, 614 F.3d at 89 n.4; *Skoien*, 587 F.3d at 813-14.

Chester urges us to adopt a strict scrutiny standard because § 922(g)(9) severely burdens an enumerated, fundamental right. This argument is too broad. We do not apply strict scru-

---

[6]We do not address any issue with respect to possession of firearms for lawful hunting purposes under the Second Amendment as neither party has raised that as an issue in this case.

tiny whenever a law impinges upon a right specifically enu-
merated in the Bill of Rights. In the analogous First
Amendment context, the level of scrutiny we apply depends
on the nature of the conduct being regulated and the degree
to which the challenged law burdens the right. For example,
a "content-based speech restriction" on noncommercial
speech is permissible "only if it satisfies strict scrutiny."
*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813
(2000). But, courts review content-neutral time, place, and
manner regulations using an intermediate level of scrutiny.
*See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).
Likewise, a law regulating commercial speech is subject to a
more lenient intermediate standard of scrutiny in light of "its
subordinate position in the scale of First Amendment values."
*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477
(1989) (internal quotation marks omitted). As Judge Sykes
observed in the now-vacated *Skoien* panel opinion:

> The Second Amendment is no more susceptible to a
> one-size-fits-all standard of review than any other
> constitutional right. Gun-control regulations impose
> varying degrees of burden on Second Amendment
> rights, and individual assertions of the right will
> come in many forms. A severe burden on the core
> Second Amendment right of armed self-defense
> should require strong justification. But less severe
> burdens on the right, laws that merely regulate rather
> than restrict, and laws that do not implicate the cen-
> tral self-defense concern of the Second Amendment,
> may be more easily justified.

*Skoien*, 587 F.3d at 813-14.

Although Chester asserts his right to possess a firearm in
his home for the purpose of self-defense, we believe his claim
is not within the core right identified in *Heller*—the right of
a *law-abiding, responsible* citizen to possess and carry a
weapon for self-defense—by virtue of Chester's criminal his-

tory as a domestic violence misdemeanant. *Heller*, 128 S. Ct. at 2821. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons. *See Marzzarella*, 614 F.3d at 97; *cf. Skoien*, 614 F.3d at 641 (en banc) ("The United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective. . . . The concession is prudent, and we need not get more deeply into the 'levels of scrutiny' quagmire . . ."). Accordingly, the government must demonstrate under the intermediate scrutiny standard that there is a "reasonable fit" between the challenged regulation and a "substantial" government objective. *Fox*, 492 U.S. at 480; *see Marzzarella*, 614 F.3d at 98 ("Although [the various forms of intermediate scrutiny] differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important' . . . [and] require the fit between the challenged regulation and the asserted objective be reasonable, not perfect."). Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government. *See Fox*, 492 U.S. at 480-81.

We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal. Having established the appropriate standard of review, we think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond. Both sides should have an opportunity to present

their evidence and their arguments to the district court in the first instance.

### IV.

For the foregoing reasons, we vacate the order of the district court and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

DAVIS, Circuit Judge, concurring in the judgment:

I concur in the judgment.

In light of the highly persuasive decision of the Seventh Circuit in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), *pet. for cert. pending*, sustaining the constitutionality of 18 U.S.C. § 922(g)(9), the district court should have no difficulty in concluding that the application of § 922(g)(9) to offenders such as Chester passes Second Amendment scrutiny, exactly as district courts have already concluded. *See United States v. Smith*, 2010 WL 3743842 (S.D.W. Va. Sept. 20, 2010) (applying *Skoien* and sustaining statute); *United States v. Staten*, 2010 WL 3476110 (S.D.W. Va. Sept. 2, 2010) (same).

### I.

On April 26, 2004, Chester savagely attacked his 22-year-old daughter, Meghan Chester ("Meghan"). Apparently, their dispute arose over what Meghan had eaten for lunch that day. In this attack, Chester slammed his daughter on the kitchen table. Meghan attempted to leave but Chester followed her, threatened her, and punched her in the face. Meghan fell to the floor in pain, but Chester continued to attack her. He began kicking her as she lay on the ground, and also dumped buckets of water over his daughter's head. After her father